**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 24-145 |
| | ) | Judge Nora Barry Fischer |
| WADE SHAW, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

I.    INTRODUCTION

In this case, Defendant Wade Shaw is charged with one count of possession with intent to distribute cocaine and methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(c). (Docket No. 3).  Presently before the Court is Defendant's Motion to Suppress Evidence and the Government's opposition thereto.  (Docket Nos. 36; 37; 39; 41).  Defendant moves to suppress evidence recovered from his vehicle after his arrest in Sharon, Pennsylvania on September 14, 2023. (Docket No. 36).  The Government counters that Defendant did not show that a warrantless search was conducted, and in the alternative, such a search would have been supported by probable cause and lawful.  (Docket No. 106).

Following receipt of the parties' initial briefs, the Court held a suppression hearing on September 16, 2025, the official transcript of which was filed on October 10, 2025.  (Docket Nos. 45; 47).  Thereafter, the parties submitted proposed findings of fact and conclusions of law on November 24, 2025, (Docket Nos. 48; 50), and responses thereto on December 29, 2025.  (Docket Nos. 52; 53).  After careful consideration of the parties' arguments in light of the credible evidence of record, and for the following reasons, Defendant's Motion is denied.

II.    BACKGROUND

*A.  Witness Credibility and Background*

1

At the hearing, the Government presented the testimony of Corporal Ryan Polichena of the City of Sharon Police Department and introduced seven exhibits: an affidavit of probable cause dated September 14, 2023; a photograph of the exterior of Defendant's vehicle prior to the search; four photographs of the interior of the vehicle and the contraband discovered therein; and a criminal complaint dated September 15, 2023.  (Docket Nos. 47 at 24–48, 75–81; 45-1).  For his case, Defendant testified and presented the testimony of Jessica Yalenty, a trial investigator at the Federal Public Defender's Office in Pittsburgh.  (*Id*. at 89–102, 111–13, 127–41).  Defendant also introduced twenty-two exhibits: four photographs of the inside of his vehicle taken by Ms. Yalenty on September 5, 2025; three video demonstrations of a Yeti cup taken by Ms. Yalenty on September 5 and September 15, 2025; body camera footage of his arrest on September 14, 2023 and four still photographs from same; and ten evidence photographs taken during the execution of a search warrant of Defendant's vehicle after his arrest.  (Docket No. 45-1).  He also cross-examined Cpl. Polichena.  (Docket No. 47 at 48–75, 82).

As is noted below, the testimony of Cpl. Polichena and Defendant conflicted in a few important respects.  Having carefully reviewed the evidence of record and evaluated the demeanor of the witnesses, it is this Court's opinion that Cpl. Polichena offered credible testimony regarding the events in question, as his version was largely corroborated by the exhibits which were presented.  *See United States v. Garcia,* 521 F.App'x 71, 73 (3d Cir. 2013) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)) ("'[w]hen findings are based on determinations regarding the credibility of witnesses ... for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'").  He also presented as an experienced law enforcement officer.  Although the Court accepts some portions of Defendant's testimony, the Court does not credit many of his assertions

which contradicted the testimony of Cpl. Polichena or lacked sufficient evidentiary support in the record.

To this end, Cpl. Polichena has approximately seven years of experience in law enforcement. (Docket No. 47 at 24). Prior to that, he graduated with a bachelor's degree in criminal justice and dual minors in sociology and psychology from Edinboro University. (*Id.* at 82–83). After receiving his certification at Mercyhurst Northeast Police Academy, he joined the City of Farrell Police Department, where he was appointed to the Critical Incident Response Team as a tactical operator. (*Id.* at 83). He joined the City of Sharon Police Department in March 2023, and he has maintained an active status on the Drug Task Force in Mercer County since 2020, a program subsidized by the Office of the Attorney General. (*Id.* at 83–84).

Defendant graduated high school in Youngstown, Ohio before joining the Marine Corps in 1993. (*Id.* at 117–18). He was medically discharged from the military after only nine months due to two fused bones in his right forearm. (*Id.* at 118). Following his discharge, he attended the New Castle School of Trades, where he earned his auto tech certificate. (*Id.* at 117). He also completed a training program in culinary arts while previously incarcerated. (*Id.* at 117–18). Prior to his arrest, he owned a restaurant in Farrell, Pennsylvania named Granddad's for approximately three years. (*Id.* at 94, 119–20). He also did part-time mechanical work at Jordan's Tires, an auto repair and tire shop in Sharon, Pennsylvania. (*Id*. at 27, 91, 119).

Jessica Yalenty is a trial investigator at the Federal Public Defender's Office ("FPD") in Pittsburgh. (*Id.* at 127). She has worked at several FPD offices throughout her 11-year tenure there. (*Id.*). Ms. Yalenty has a bachelor's degree in criminal justice administration and she has previously testified in other matters. (*Id.* at 148). She is on Defendant's case team; as such, she was assigned to investigate this matter. (*Id.* at 127).

B. *Defendant's Arrest*

On the evening of September 14, 2023, Cpl. Polichena was on patrol near the intersection of Morrison Street and New Castle Avenue in the City of Sharon. (Docket No. 47 at 25–26). During a patrol briefing meeting earlier that day, he learned that Defendant had an outstanding warrant for his arrest. (*Id.* at 25–26). Cpl. Polichena testified that he was familiar with Defendant; he had previously interacted with him on a number of occasions and he participated in at least one criminal investigation involving Defendant. (*Id.* at 25, 51). He was also aware that Defendant's criminal history included several convictions for drug offenses. (*Id.* at 25).

At approximately 6:15 p.m., Cpl. Polichena saw a white, T-top Oldsmobile with customized Ohio license plates pull into Jordan's Tires located at the intersection of Morrison Street and New Castle Avenue. (*Id.* at 27). He testified that this vehicle was distinct due to its older model frame, customized license plates, and out-of-state registration. (*Id.*). The two-door T-top vehicle had unique features, i.e., the roof had two removable glass panels above the driver's seat and passenger seat. (*Id.* at 92). Cpl. Polichena was aware that Defendant had been seen operating this same vehicle a few days earlier. (*Id.* at 26). He further testified that he had personally observed Defendant driving this vehicle on multiple occasions prior to that day. (*Id.* at 49–50).

Accordingly, Cpl. Polichena pulled over and parked his patrol car on the curb outside of Jordan's Tires. (*Id.* at 26, 28). Two other law enforcement officers in separate vehicles had joined Cpl. Polichena at that point: his supervisor, Sergeant Sonny, and Agent McCutcheon from the state Probation and Parole Office. (*Id.* at 26, 50). As Cpl. Polichena exited his patrol car, he saw Defendant, the only occupant in the white vehicle, exit from the driver's side door. (*Id.* at 28). Cpl. Polichena called out to Defendant as all three officers approached him and then placed him

4

under arrest near the trunk of his car. (*Id.* at 28, 94). Defendant stated that he noticed police vehicles near Jordan's Tires before he parked his car, but he did not realize that the officers were in the area to arrest him until they called out his name. (*Id.* at 93). Cpl. Polichena testified that Defendant did not close his driver's door after he exited his vehicle, but Defendant said that he closed the door and that doing so was "routine" for him. (*Id.* at 29, 91).

As Defendant was being detained on the outstanding warrant, Cpl. Polichena smelled an odor of burnt marijuana emanating from his person. (*Id.* at 29). He conducted a search of Defendant's person, which revealed a clear baggie of what appeared to be crack cocaine in his sweatshirt pocket and approximately $800 of U.S. currency in his wallet. (*Id.* at 29). The audio from the body camera footage of the arrest also establishes that, when Defendant was handcuffed and standing near the trunk of his vehicle, an officer asked an indiscernible question to which Defendant responded, "Molly, some weed," then a few seconds later, as Cpl. Polichena was conducting a pat-down search of Defendant, he asked, "Where is your weed, man . . . in here?" (Ex. G at 0:55–1:18).

Around that same time, Sergeant Sonny asked Defendant if he "wanted his car locked up or closed up," and Defendant responded, "my nephews got it." (*Id.* at 31, 76; Ex. G at 1:08–1:14). Cpl. Polichena walked to the driver's side door, which he stated was still open at that point, briefly looked inside the vehicle as he stood outside of it, and then shut the door. (*Id.* at 31, 76–77). Body camera footage is consistent with his testimony; he can be seen standing outside an open driver's door, looking inside the car without entering the interior, and then closing the door. (Ex. G at 1:29–1:39). Cpl. Polichena referred to where he stood during this time as the "B pillar" of the vehicle, which he described as the rear edge of the driver's door, towards the middle of the vehicle. (Docket No. 47 at 32–33, 77). It is undisputed that Cpl. Polichena did not see any contraband

when he looked inside the vehicle from this vantage point.  (Docket Nos. 48 ¶ 31; 50 ¶ 6).  After closing the driver's door, Cpl. Polichena asked Sergeant Sonny and Agent McCutcheon to remain with the vehicle as he escorted Defendant to his patrol car.  (Docket No. 47 at 30).  He testified that he asked them to stay with the vehicle because he intended to obtain a search warrant for it. (*Id.* at 30–31, 33, 78).

The  Court  rejects  Defendant's  assertion  that  his  driver's  door  was  closed  and  Cpl. Polichena opened it to look inside.  To that end, Defendant testified that he never saw anyone inside of his car before being placed in the patrol car.  (*Id.* at 108–09).  And although he explained that he routinely closed his car door, he admitted that the situation—having police call out his name—was "not at all" routine.  (*Id.* at 110).  Importantly, while the body camera footage does not clearly show the driver's door before it was closed, Cpl. Polichena cannot be seen opening the door.  (Ex. G at 0:53–1:39).  This is consistent with Cpl. Polichena's testimony.  *See, e.g.*, Docket No. 47 at 57 ("Q. You'd agree with me that you don't see his front driver-side door open?  A. It doesn't appear so.  It's a T-top vehicle, so you wouldn't see it in this photo from this angle."); *id.* at 58–59 ("Q. You'd agree in both of those pictures and the video we just saw, you have your hand on the door handle, and you opened that door and closed it?  A. No.  I would not agree that I opened that door . . . Q. You don't agree on the video you pulled that door open?  A. No.").

From the Court's view, the body camera footage supports an inference that the door was left open by Defendant when he exited the vehicle.  As Cpl. Polichena approaches the driver's door, the white frame and base of the side-view mirror can be seen through the back windshield:



(Ex. G at 1:29). However, after the door was closed, only the actual mirror can be seen through

the back windshield from almost the same point of view:



(Ex. G-4). Common sense dictates that a vehicle's side-view mirror points further away from the body of the car as the door is opened. Comparing the two screenshots from the video above, it is apparent that the driver's side-view mirror is facing outward in the first photo, and inward in the second. Not only can the movement of the mirror be seen more clearly in the video, but the audio also further substantiates this conclusion. When Cpl. Polichena closes the door, a loud sound consistent with a door being closed on an older model vehicle can easily be heard. (Ex. G at 1:36). But the audio is devoid of any sound consistent with the door being opened before that point. (*Id.* at 1:27–1:36). In sum, the footage strongly supports an inference that the driver's door was already open when Cpl. Polichena walked over and shut it, which further corroborates his credible testimony.

Once Defendant was secured inside his patrol car, Cpl. Polichena returned to Defendant's vehicle. (Docket No. 47 at 33–34). The officer with the active body camera was not present during these events and the following actions by the officers on the scene were not recorded. (*Id.* at 73–74). By this time, more law enforcement officers had arrived on scene, including Corporal Evan Nan of the Sharon Police Department.[1] (*Id.*). When Cpl. Polichena reapproached the vehicle, Cpl. Nan informed him that he had observed a baggie of marijuana on the front passenger floor area. (*Id.* at 34). Cpl. Nan stands at 6 feet, 7 inches tall, which is approximately a foot taller than Cpl. Polichena. (*Id.* at 36). Cpl. Polichena testified that Cpl. Nan's height gave him a better vantage point to see inside the vehicle through the T-top roof. (*Id.*). Cpl. Nan subsequently pointed out the location of the marijuana to Cpl. Polichena and he was able to observe it too. (*Id.* at 35–36).

Defendant confirmed that there was marijuana on the passenger-side floorboard area, but he maintained that it was not visible from the outside of the vehicle because he placed it underneath

---

[1] The Court notes that Cpl. Nan was present for the suppression hearing. Although he was available to testify, he was not called as a witness by either of the parties. (Docket No. 47 at 3).

the passenger seat. (*Id.* at 98–101, 106). The Court once again credits Cpl. Polichena's account, as his testimony regarding the location and visibility of the marijuana was more consistent, detailed, and plausible. In this regard, Defendant acknowledged that the floorboard area is visible from the outside of his vehicle even when the doors are closed, including the area up to the edge of the driver's seat and the edge of the passenger seat. (*Id.* at 104). These admissions are consistent with Cpl. Polichena's credible testimony that Cpl. Nan initially viewed the marijuana from outside the vehicle due to his height and the open T-top roof, then subsequently informed him about it and pointed out its location.

Cpl. Polichena walked back to the driver's side door and stood next to the "A pillar" of the vehicle—i.e., near the front windshield and door hinge—and specifically looked at the floorboard. (*Id.* at 32, 34). From this viewpoint, Cpl. Polichena saw a clear knotted baggie containing a hard white substance and several suboxone strips underneath the front edge of the driver's seat. (*Id.* at 34–35). Cpl. Polichena testified that, based on his training and experience, he recognized the clear knotted baggie as the standard packaging for illicit substances sold in the area. (*Id.* at 35).

Defendant remained in Cpl. Polichena's patrol car during this time, which was parked approximately twenty to thirty yards away from his vehicle. (*Id.* at 108). Defendant testified that he could see the back of his vehicle from where he was seated but he was "unsure" what happened at his car because he was mostly "sitting there with his head down." (*Id.* at 113–14). When pressed about this, he admitted that he "might have glanced over there" and he only saw officers "walking around." (*Id.* at 112, 114).

### C.  The Search of the Vehicle

After making these observations, Cpl. Polichena returned to his patrol vehicle and transported Defendant to the Sharon Police Department for processing. (*Id.* at 38). Meanwhile,

Defendant's vehicle was towed to a private garage for preservation pending service of a search warrant. (*Id.*). Upon arriving at the station, Cpl. Polichena prepared the search warrant for Defendant's vehicle. (*Id.* at 39). In the supporting affidavit, he detailed the odor of burnt marijuana he smelled emanating from Defendant; the crack cocaine and large sum of currency recovered from Defendant's person; and the marijuana, suboxone strips, and suspected narcotics he observed from outside the vehicle. (Ex. 1 at 3). He also stated that "[d]ue to [his] recovery of the suspected crack cocaine from [Defendant's] person as well as the large sum of currency" prior to reapproaching the vehicle, "[he] did have the intention of seizing this vehicle with the intention of applying for a search warrant." (Ex. 1 at 3). After Cpl. Polichena obtained the warrant, he assisted with the search of Defendant's vehicle later that evening, during which the contraband that he had observed in plain view was seized, along with additional baggies of suspected narcotics and a digital scale. (Docket No. 47 at 37–48, 53–54).

The witnesses' testimony conflicts regarding the location of the contraband in Defendant's vehicle and the Court once again adopts the version provided by the Government's credible witness. In this regard, the Court rejects Defendant's assertion that law enforcement manipulated and staged the contraband in his vehicle to make it appear like it was in plain view. This accusation primarily arises from two evidence photographs captured at the outset of the vehicle search which show a silver Yeti cup tipped over in between the front seat and console with clear knotted baggies of narcotics resting on the lid of the cup on the floorboard below it. (*Id.* at 68–69; Ex. L; Ex. M). Cpl. Polichena clarified that he did not observe all the knotted baggies in the photographs when he stood outside the vehicle earlier that day, only one. (Docket No. 47 at 69–70). However, Defendant testified that *all* the items on the floor in these photographs were inside the Yeti cup,

which was upright with the lid secured, pressed in between the front seat and the console when he exited the vehicle. (*Id.* at 96–97)

Yet, there is no credible evidence that any law enforcement officer opened the Yeti cup and placed the contraband on the floorboard to make it appear as if it had spilled out in order to stage the evidence photographs, as Defendant suggests. To that end, the Court does not accept Defendant's testimony that the clear knotted baggie that Cpl. Polichena observed was not visible from outside of his vehicle, but rather in a Yeti cup that he kept between the console and front seat. (Docket No. 47 at 95–98). And the Court further disregards his claim that he kept his Yeti cup in that location because it did not fit in his cupholder, and that it remained there because he had to "push the cup in there so it [didn't] move" and the space was "real tight." (*Id.* at 97).

Rather, the Court credits the testimony of the Government's credible witness, which provided no indication of evidence tampering or fabrication. In this respect, Cpl. Polichena never saw any law enforcement officers open the vehicle's doors or stick their heads through the window when he was on the scene. (*Id.* at 37). Nor did Defendant, for that matter. (*Id.* at 108–09, 116). Instead, Defendant posited that that any entrance into his vehicle must have occurred after he left the scene. *See id.* at 109 ("Q. If they entered your car, it would have had to have been sometime after Corporal Polichena drove you away to the Sharon Police Department? A. I would say yes.").

Moreover, the Sharon Police Department operates under a standard procedure once they determine that there is probable cause to seize a vehicle, and they ensure that no one has access to the interior of the vehicle—law enforcement or civilians—to preserve the sanctity of the evidence that may be inside. (*Id.* at 37). Here, multiple officers arrived on the scene and remained with Defendant's vehicle to maintain its security until the tow truck arrived. (*Id.* at 37–38). Then, Cpl. Nan and another officer followed the vehicle as it was transported by the tow company to the City

of Sharon's private garage, which is a gated and locked facility under constant surveillance.  (*Id.* at 38–39).  Then, the vehicle was secured according to the agency's protocols and policies.  (*Id.* at 39).  Further, Cpl. Polichena explained that the initial set of photographs taken during the execution of the search warrant try to capture the scene in an undisturbed state or "as close as [law enforcement] can possibly get it," but he acknowledged that it is "not going to be pristine."  (*Id.* at 62–63).  In particular, he explained that when the front of a vehicle is lifted up during towing, items inside the car move around.  (*Id.* at 68).

Overall, the Court finds that Cpl. Polichena's testimony and version of events simply makes more sense than Defendant's, particularly given that law enforcement officers monitored the vehicle from the moment Defendant exited at Jordan's Tires to its arrival at a secure facility. There is no apparent reason why law enforcement would have expended the time and energy to preserve the integrity of the vehicle, only to invalidate their efforts by planting evidence.  It is more plausible that the Yeti cup was disturbed during the towing process, rather than the result of illegal staging.  While the Court appreciates that Ms. Yalenty conducted experiments inside Defendant's car in an effort to demonstrate how much force must be applied for his Yeti cup to come loose, it cannot discount her testimony that the accuracy of these experiments is based on the veracity of Defendant's testimony.  *See id.* at 141 ("Q. Ms. Yalenty, do you agree with me that a lot of the work that you've done – in fact, all of the work regarding the Yeti cup depends on the accuracy of Mr. Shaw's statement that the drugs were in the Yeti cup, correct?  A. Correct.  Q. So if the drugs weren't in the Yeti cup, the experimentation, all of that is largely meaningless?  A. Sure.").  She also conducted these experiments nearly two years after the incident and only a few weeks before the Court's hearing.  (*Id.* at 131–32).[2]  In sum, the Court declines to draw any adverse inference

---

[2]  Ms. Yalenty also testified about the metadata of two other evidence photographs, marked as Exhibits I and K, that both show the driver's side area of the car with the door open.  (Docket No. 47 at 137–40).  The only noticeable

against the Government for the overturned Yeti cup and accepts the rationale provided by Cpl. Polichena for its position in the evidence photographs.

### D. Subsequent Events and Procedural History

On the day following the arrest, Defendant was charged by a criminal complaint, supported by an affidavit of probable cause sworn by Cpl. Polichena, which detailed the contraband found on his person and during the subsequent search of his vehicle. (Docket No. 47 at 46, 48; Ex. 7). A federal grand jury returned an indictment containing the present charges on June 25, 2024. (Docket No. 3). Thereafter, Magistrate Judge Taylor ordered that Defendant be detained pending trial at his detention hearing on July 12, 2024, the official transcript of which was filed on July 25, 2024. (Docket Nos. 22, 24). Defendant did not appeal or challenge this decision.

The instant motion was filed on June 3, 2025, and the Government submitted its response on June 18, 2025. (Docket Nos. 36; 37). Defendant filed a reply on July 2, 2025, to which the Government declined to submit a sur-reply. (Docket Nos. 39; 41). In the Government's response, it argued that Defendant must present affirmative evidence, including witness testimony, to establish his standing to challenge the vehicle search before the Government presents its case-in-chief on suppression. (Docket No. 37). The Court overruled this position and reserved ruling on whether Defendant had established standing until the conclusion of suppression proceedings.

---

difference between the two photographs is that Exhibit K shows an evidence marker on the floorboard next to what appears to be suboxones strips, and Exhibit I does not. (Docket Nos. 45-18; 46-20). Ms. Yalenty testified that the photographs' metadata indicates that Exhibit I was taken on September 14, 2023 at 9:14 p.m. and Exhibit K was taken at 9:17 p.m. on the same date. (Docket No. 47 at 137–40; Ex. I-1; Ex. K-1). The Court does not accept Defendant's assertion that the only reason the suboxone strips are not visible in the earlier photo is because the officers staged the later photo. Cpl. Polichena testified that the position of the suboxone strips in Exhibit K is "similar" to where he had seen them earlier in the day, but not exact. (Docket No. 47 at 67–68). He further acknowledged that some items are manipulated as a search progresses. (*Id.* at 64). Hence, the Court agrees with the Government that the more reasonable explanation for the difference between Exhibits I and K is that the suboxone strips slid slightly forward once the officers searched underneath the driver's seat. (Docket No. 53 at 4).

(Docket No. 42).  The Government abandoned its argument that Defendant lacked standing to challenge the search at the conclusion of the suppression hearing.  (Docket No. 47 at 150–51).

The Court then conducted a hearing on September 15, 2025, and received the transcript of those proceedings on October 10, 2025, proposed findings of fact and conclusions of law from the parties on November 24, 2025, and responses thereto on December 29, 2025.  (Docket Nos. 45; 47; 48; 50; 52; 53).  In the interim, the Court granted Defendant's unopposed motion to expand the record on November 25, 2025, admitting Exhibits I-1 and K-1 into the record of the suppression hearing.  (Docket Nos. 50; 51).  As the matter is fully briefed, it is now ripe for disposition.

III.    LEGAL STANDARD

It is well-settled that, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge."  *United States v. Burrus*, 402 F. Supp. 3d 116, 122 (W.D. Pa. 2019) (quoting *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007)).  In addition, the Court may consider the extent to which video evidence contradicts or corroborates a witness's testimony in making credibility determinations.  *See United States v. Colvin*, No. 23-2041, 2024 WL 3023178, at *2 n.9 (3d Cir. June 17, 2024) ("[W]hat the video actually shows is a pedestrian taking a step into the street, within a crosswalk, and stopping immediately as Colvin made a right turn into the same crosswalk. Far from contradicting it, the video corroborates Simpson's testimony.").  Moreover, "'hearsay testimony is admissible at suppression hearings ... and should be considered by a district court' if reliable."  *United States v. Montalvo-Flores*, 81 F.4th 339, 344 (3d Cir. 2023) (quoting *United States v. Miramonted*, 365 F.3d 902, 904 (10th Cir. 2004)).

IV.    DISCUSSION

As noted above, Defendant moves to suppress all the evidence obtained following the search of his vehicle on September 14, 2023. He contends that law enforcement illegally searched and seized his vehicle prior to obtaining a warrant, thereby discovering the contraband inside his Yeti cup, which they subsequently staged and manipulated, and then referenced in the warrant application as a basis for probable cause. (Docket Nos. 36; 39; 50; 52). He further asserts that Cpl. Polichena illegally searched his vehicle when he allegedly opened his driver's side door and looked inside his vehicle. (*Id.*). The Government counters that Defendant has not met his threshold burden of proving that a pre-warrant search of his vehicle took place, and even if one had occurred, the search would have been lawful under two exceptions to the warrant requirement, the automobile exception or as a search incident to arrest. (Docket Nos. 37; 48; 53). And, even if another officer conducted a pre-warrant search of the car, the Government argues that the inevitable discovery doctrine prohibits suppression because Cpl. Polichena would have secured a search warrant for the vehicle independent of any unlawfully obtained evidence. (*Id.*).

The legal principles at issue in this case are rooted in the Fourth Amendment, which protects citizens against unreasonable searches and seizures. U.S. Const. amend. IV. Warrantless searches and seizures are per se unreasonable, subject only to a few specifically established and well-delineated exceptions. *Horton v. California*, 496 U.S. 128, 133 (1990). "As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). But, "once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Id.*

Having carefully considered the parties' positions in light of the evidence of record, the Court agrees with the Government that the instant suppression motion must be denied.

*A.  No Warrantless Search Was Conducted*

At the outset, Defendant claims that two illegal searches of his vehicle occurred, when: (1) Cpl. Polichena purportedly opened his driver's side door and looked inside his vehicle before closing it, and (2) law enforcement officers allegedly entered his vehicle and discovered the contraband inside his Yeti cup prior to obtaining a warrant.  In this Court's estimation, Defendant's contentions are both legally and factually untenable.

With respect to vehicles, although "the interior of an automobile is not subject to the same expectations of privacy that exist with respect to one's home, a car's interior as a whole is nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the police." *New York v. Class*, 475 U.S. 106, 114–15 (1986).  At the same time, the Supreme Court has held that there is "no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers."  *Texas v. Brown*, 460 U.S. 730, 740 (1983) (citations omitted).

In a broader sense, the Supreme Court has explained that there is an important distinction between "plain view" discoveries used "to justify [the] *seizure* of an object," and "an officer's mere observation of an item left in plain view."  *Id.* at 739 n.4.  "Whereas the latter generally involves no Fourth Amendment search . . . the former generally does implicate the Amendment's limitations upon seizures of personal property."  *Id.* (citations omitted).  Additionally, "[t]he information obtained as a result of observation of an object in plain sight may be the basis for probable cause or reasonable suspicion of illegal activity."  *Id.*  "The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment—or at least no search independent of the

initial intrusion that gave the officers their vantage point." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

Here, the Court agrees with the Government that Defendant has not met his threshold burden of showing that a warrantless search of his vehicle occurred. As a factual matter, the Court credits the testimony of Cpl. Polichena and finds that he did not conduct a warrantless search of Defendant's vehicle when he closed the driver's door that Defendant left open. As discussed above, Cpl. Polichena's testimony is supported by the different positions of the side-view mirror in the body camera footage, as well as the fact that the audio only contains the clear sound of the door closing. (Ex. G at 1:29–1:36). Notwithstanding Defendant's assertion that Cpl. Polichena opened the door, his testimony is actually consistent with this account, as he provided no indication that he saw Cpl. Polichena open the door or enter the interior of the vehicle, despite his close proximity to his vehicle when these alleged events occurred. (Docket No. 47 at 108–09, 116). In any event, it is uncontested that Cpl. Polichena did not observe any of the challenged evidence in plain view when he peered inside the vehicle before closing the door. (*Id.* at 31–32). Thus, under these circumstances, where a police officer merely looks through an open door of vehicle without entering the interior or seizing any contraband therein, there is no search within the meaning of the Fourth Amendment. *See United States v. Hawkins*, 646 F. App'x 254, 257 (3d Cir. 2016) ("Any member of the public could have approached the vehicle and through the open door observed the revolver handle sticking out from under the driver's seat.").

Next, the Court credits the testimony of Cpl. Polichena and finds that he did not conduct a warrantless search of Defendant's vehicle when he stood outside the vehicle and observed marijuana, suboxone strips, and a clear baggie containing a white substance on the floorboards. Defendant's assertion that law enforcement officers illegally searched his vehicle and discovered

this contraband in his Yeti cup prior to obtaining a search warrant is not supported by any credible evidence of record. To that end, the Court rejects Defendant's testimony that the marijuana and clear knotted baggie were not visible from outside his vehicle. It also declines to draw any inference of impropriety for the overturned Yeti cup in the evidence photographs, as Cpl. Polichena's testimony provided a more credible and logical explanation for its position. *See United States v. Lynch*, 290 F. Supp. 2d 490, 498 (M.D. Pa. 2003), *aff'd*, 214 F. App'x 248 (3d Cir. 2007) ("It is plausible that given the amount of jarring in a towing the gun came into plain view when it had not been before.").

Moreover, Defendant's testimony once again did not conflict with Cpl. Polichena's account; while he admitted that he could see the back of his vehicle and may have glanced in its direction while inside the patrol car, he ultimately denied knowing what happened at his vehicle during that time. (Docket No. 47 at 112–14). But, Defendant's lack of knowledge regarding the officers' actions at his vehicle does not establish that a warrantless search was conducted. Defendant further speculated that if the police entered his vehicle, it was after he left the scene with Cpl. Polichena, the same officer who referenced the allegedly hidden contraband in his affidavit of probable cause. (*Id.* at 109). This conjecture is not only illogical, but also insufficient to prove by a preponderance of the evidence that a warrantless search occurred.

Because "an officer's mere observation of an item left in plain view" generally does not involve a Fourth Amendment search, the Court finds that Cpl. Polichena's plain view observations from a lawful vantage point, i.e., outside Defendant's vehicle, did not amount to a search. *Brown*, 460 U.S. at 739 n.4. It was further permissible for "[t]he information obtained as a result of [those] observations" to serve as a basis for probable cause. *Id.* Accordingly, the Court finds that

Defendant failed to demonstrate by a preponderance of the evidence that a warrantless search of his vehicle occurred.

### B. The Automobile Exception

Even assuming that Defendant sufficiently established that law enforcement conducted a warrantless search of his vehicle, the Court agrees with the Government that it would have been permissible under the automobile exception to the warrant requirement. As this Court previously wrote:

> The United States Court of Appeals for the Third Circuit has recognized the "broad sweep of the automobile exception," pursuant to which a vehicle may be searched without a warrant upon a showing of probable cause that evidence of a crime may be located in the vehicle. [*United States v. Donahue*, 764 F.3d 293, 300 (3d Cir. 2014)]. As the Court of Appeals explains,
>
> the automobile exception includes two important elements specific to that exception: First, "[i]f probable cause justifies the search ..., it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." [*United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)]. Second, probable cause does not dissipate after the automobile is immobilized because the exception does not include an exigency component. *Maryland v. Dyson*, 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999). As a result, the government can search an impounded vehicle without a warrant even though it has secured the vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search. *See Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982); *see also United States v. Johns*, 469 U.S. 478, 486–87, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985) (extending the rule to closed packages seized from vehicles). *Donahue*, 764 F.3d at 300 (3d Cir. 2014).
>
> The probable cause inquiry "is entirely objective," *Halsey v. Pfeiffer*, 750 F.3d 273, 299 (3d Cir. 2014), and is "commonsense," "practical," and "nontechnical;" it is based on the totality of the circumstances and is judged by the standard of "reasonable and prudent men." *Illinois v. Gates*, 462 U.S. 213, 230-31, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (internal quotation marks and citations omitted). The Court evaluates "the events which occurred leading up to the ... search, and then ... [decides] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to ... probable cause." *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). If there was a "fair probability that contraband or evidence of a crime" would have been found, there was probable cause for the search. *Gates*, 462 U.S. at 238, 103 S.Ct. 2317.

*United States v. Robertson*, No. CR 18-264, 2020 WL 3574368, at *10–11 (W.D. Pa. June 29, 2020) (quoting *United States v. Somerville*, Crim. No. 17-222, 2019 WL 1316413, at *7–8 (W.D. Pa. Mar. 22, 2019)).  Further, "[i]t is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (citing *United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004); *United States v. Winters*, 221 F.3d 1039, 1042 (8th Cir. 2000)).

Prior to Cpl. Polichena approaching the driver's side door of Defendant's vehicle, the following facts were known by law enforcement:

- Cpl. Polichena smelled an odor of burnt marijuana emanating from Defendant's person;
- Cpl. Polichena recovered a clear baggie of what appeared to be crack cocaine and approximately $800 of U.S. currency from Defendant's person;
- Defendant told the officer conducting his pat-down search that he had "molly" and "some weed," but no marijuana was recovered on his person; and,
- Defendant's criminal history included several convictions for drug offenses .

(Docket No. 47 at 25, 29; Ex. G at 0:55–1:18).  In short, Cpl. Polichena's uncontested testimony that he smelled burnt marijuana emanating from Defendant's person, coupled with the facts that Defendant told one of the officers that he had marijuana—which was not recovered during his pat-down search—likely provided enough probable cause to search the vehicle for evidence of illegal narcotics.  *See United States v. Green*, 897 F.3d 173, 186 (3d Cir. 2018).  Defendant's criminal history, as well as the recovery of suspected crack cocaine and a large amount of currency on his person, further bolstered the probability that contraband would be found inside the vehicle.  *See United States v. Mathurin*, 561 F.3d 170, 176–77 (3d Cir. 2009) (finding that an individual's criminal record was a valid consideration in assessing reasonable suspicion); *United States v. Lackey*, No. 20-2978, 2022 WL 313807, at *2 (3d Cir. Feb. 2, 2022) (recovery of marijuana from

defendant's person, *inter alia*, was a valid consideration in assessing probable cause for a vehicle search).

When considered in totality, the above facts established sufficient probable cause to search the vehicle before Cpl. Polichena even approached the driver's door. Accordingly, the Court alternatively holds that the Government demonstrated by a preponderance of the evidence that a pre-warrant search of Defendant's vehicle would have been authorized under the automobile exception.[3]

### C. Seizure of the Vehicle

Defendant also incorrectly argues that the tow of his vehicle to the City of Sharon's private garage amounted to an illegal seizure. (Docket No. 36). To the contrary, the law is well established that "when officers have probable cause to believe that personal effects may contain evidence, the Fourth Amendment is permissive: They may . . . 'seize[ ] and secure[ ]' the item 'to prevent destruction of evidence while seeking a warrant.'" *United States v. Woodley*, 788 F. App'x 100, 104 (3d Cir. 2019) (quoting *Riley v. California*, 573 U.S. 373, 388 (2014). As discussed above, the police had ample probable cause to believe that the vehicle contained contraband or evidence of drug-related offenses. Given same, the vehicle was towed to a private, secure facility while Cpl. Polichena obtained a search warrant pursuant to routine police procedures. Accordingly, the pre-warrant seizure of the vehicle was lawful. *See id.*

### D. Inevitable Discovery

---

[3]    The Court need not address the Government's second argument that a search of the vehicle would have been lawful under the search-incident-to-arrest exception given that Defendant was: (1) promptly handcuffed and placed in the backseat of a police vehicle, and (2) arrested on an outstanding warrant for attempted burglary, rather than a drug-related offense. *See United States v. Brown*, 765 F.3d 278, 290 (3d Cir. 2014) (quoting *Davis v. United States*, 564 U.S. 229, 235 (2011) ("Officers may conduct a warrantless search of a vehicle incident to arrest in two instances: (1) if the arrestee is within reaching distance of the vehicle during the search, or (2) if police have reason to believe that the vehicle contains 'evidence relevant to the crime of arrest.'"). In light of the Court's finding that a search would have been permissible under the automobile exception, further analysis of this position is not necessary.

The Court also alternatively holds that the Government has demonstrated that the doctrine of inevitable discovery would otherwise save the challenged evidence from exclusion because "the police, following routine procedures, would have inevitably uncovered the evidence." *United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (citing *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998)).

"Evidence obtained by the police unlawfully may nonetheless be admitted into evidence 'if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means[.]'" *United States v. Bradley*, 959 F.3d 551, 557 (3d Cir. 2020) (quoting *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998)). This burden can be met "by establishing 'that the police, following routine procedures, would inevitably have uncovered the evidence.'" *Stabile*, 633 F.3d at 245 (quoting *Vasquez De Reyes*, 149 F.3d at 195). "The inevitable discovery analysis focuses on historical facts capable of ready verification, not speculation." *Id.* (internal quotation marks and citation omitted).

Even assuming *arguendo* that another officer conducted a warrantless search of the vehicle, the police would have inevitably discovered the evidence therein because Cpl. Polichena would have still obtained a search warrant. *See United States v. Restitullo*, 796 F. App'x 76, 80 (3d Cir. 2019) ("The police here would have inevitably discovered the evidence of Restitullo's crimes using a routine police procedure—a warrant supported by probable cause."). As the discussion in the preceding sections of this Opinion demonstrates, there was more than enough evidence to support probable cause to search the vehicle. *See* §§ IV(A)–(B), *supra*. Moreover, Cpl. Polichena testified that he asked the other officers on the scene to remain with the vehicle before he escorted Defendant to his patrol car because he intended to apply for a warrant. (Docket No. 47 at 30–31, 33, 78). This testimony is bolstered by his affidavit of probable cause, in which he stated that he

intended to apply for a warrant after recovering suspected crack cocaine and a large amount of currency on Defendant's person.  (Ex. 1 at 3).  Accordingly, the challenged evidence inside Defendant's vehicle would have been inevitably discovered by the law enforcement officers following routine police procedures.  *See Bradley*, 959 F.3d 551, 557.

V.    CONCLUSION

Based on the foregoing, Defendant's Motion to Suppress [36] is DENIED.   An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

Dated:  January 26, 2026

cc/ecf:  All counsel of record